**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190378-U

Order filed November 25, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0378 Circuit No. 18-CF-204 |
| MONTGOMERY L. RITCHEY, | ) ) ) | Honorable Michael D. Risinger, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion by allowing the State to present propensity evidence during defendant's trial for the offenses of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Defendant failed to establish ineffective assistance of counsel or plain error regarding multiple evidentiary claims. The State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt of predatory criminal sexual assault of a child and aggravated criminal sexual abuse.

¶ 2    Defendant, Montgomery L. Ritchey, appeals his convictions for predatory criminal

sexual assault of a child and aggravated criminal sexual abuse. Defendant contends the trial court

abused its discretion by allowing the State to present evidence to demonstrate defendant's propensity to commit the crimes charged. Defendant contends defense counsel's failure to levy certain objections at trial resulted in ineffective assistance of counsel and amounted to plain error. In addition, defendant argues that the State's evidence was insufficient to prove defendant guilty beyond a reasonable doubt.

¶ 3                                     I. BACKGROUND

¶ 4        On April 19, 2018, the State charged defendant by indictment with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and two counts of aggravated criminal sexual abuse against the same victim (720 ILCS 5/11-1.60(c)(1)(i) (West 2018)). The offenses were allegedly committed between 2007 and 2011.

¶ 5                                    A. Pretrial Orders

¶ 6        Prior to trial, the State filed two separate motions *in limine*. The trial court granted the State's unopposed motion *in limine* pursuant to section 115-7(a) of the Code of Criminal Procedure of 1963 (Code), barring any evidence of the prior sexual conduct of D.R., or any other purported victim of defendant's sexual misconduct. 725 ILCS 5/115-7(a) (West 2018).

¶ 7        The State also filed a motion *in limine* that sought the court's permission to present evidence establishing defendant's propensity to commit sex offenses pursuant to section 115-7.3 of the Code. 725 ILCS 5/115-7.3 (West 2018). Defense counsel opposed the motion on the grounds that the prejudicial effect of this propensity evidence outweighed any arguable probative value. Consequently, the trial court conducted a hearing to determine the probative value of this propensity evidence.

¶ 8        During this motion hearing, the State informed the court that the pending charges involved a single victim, D.R. However, the State intended to introduce evidence that defendant

2

sexually abused other minors, namely, A.M. and G.M., to establish defendant's propensity to commit acts of sexual misconduct against young female children. According to the State, defendant was A.M.'s stepfather for a short period of time. When A.M. was five or six years old, in approximately 1998 or 1999, defendant placed his hand underneath A.M.'s underwear and began rubbing her vagina. Later, in 2000 or 2001, when A.M. was approximately seven or eight years old, defendant asked if A.M. wanted to kiss his penis, and A.M. kissed defendant's penis. Allegedly, when G.M. was six to eight years old, in approximately 2007-2009, she woke up to find defendant with his hand touching her vagina beneath her undergarments.

¶ 9    On February 19, 2019, the trial court made the following findings before granting the State's request to present other victims of defendant's sexual misconduct as propensity witnesses:

"as to proximity in time, we have very recent events. In one case occurring at the exact same time as these alleged events. The others not separated by decades.

I think that would be something that, proximity in time, the Appellate Court would expect a Court to say, boy, we're talking about something that maybe an individual did as a Defendant, you know, as a teenager as opposed to being a grown adult. I think that would be very significant.

That's not what we're talking about here. It's not separated by decades. *** you're not even talking on single decade *** The factual similarity, very similar the type of abuse, and here's something that I think would be also that the Appellate Court would expect us to look at.

3

We're not talking about on, in the one occasion, some very deviant sexual activity that, you know, might involve, you know, whips and costumes and something very, very strange. Totally different circumstances.

That's not evident here. It's the same type of sex. All of these happened in the Defendant's residence, so that's another similarity, and, you know, at night typically. Age of the victim. There's just a lot of similarities here, and then the third category as to any other relevant factors.

Well, all the victims were family members in a way, or household members is maybe a better way to put it, of the Defendant ***

It's just the one was unrelated, but they all have a connection to the Defendant, being some sort of family member or household member to varying degrees, and I haven't thought about this previously, but the State's argument that, take it in terms of — well, we all know this.

7.3 was passed so that jury would hear propensity evidence, which they don't get to hear in pretty much everything else, but the State legislature says, you do in this type of case, and the defense, as argued by the State, I thought it was quite interesting. The defense is, she's lying.

I believe this evidence is permissible under the Statute. It is very, very probative. It is also prejudicial. There's no way around it, but in this particular case, all of the factors that go into supporting, as the Statute lays out, I think argue in favor that this evidence comes in, so even though it is prejudicial, it is not unduly prejudicial.

Any propensity evidence is going to be prejudicial. Any good evidence is going to be prejudicial to one side or the other, and that's certainly the case here.

I'm going to grant the motion. Obviously we need a jury instruction, and [defense counsel] is going to need to look that over, because I think it makes sense that I inform the jury as to why they're hearing this, because we certainly don't want to have a trial within a trial on those old events."

¶ 10                                    B. Jury Trial

¶ 11        Defendant's jury trial began on March 19, 2019. By stipulation, the parties agreed that defendant's date of birth was April 5, 1968, and D.R.'s date of birth was March 2, 1999.

¶ 12        Latitia Schneider (Tish) testified that she was married to defendant from 1997 to 2001. Prior to their marriage, Tish had three children Danielle, A.M., and Jordan, and defendant had two children, Nathan, and Monica. Tish's children lived in the same household with her and defendant while defendant's children would visit on the weekends.

¶ 13        During the course of their marriage, Tish and defendant had one child together, D.R. Their marriage ended when D.R. was one year old. At that time, defendant began dating Bobette Spillman. Tish testified that D.R. visited defendant and Bobette at defendant's home in Creve Coeur, Illinois, every other weekend until she was 14 or 15 years old.

¶ 14        Tish testified that at some point, D.R. did not want to visit defendant anymore. Tish assumed D.R. did not want to see defendant because of their ongoing verbal disagreements. Tish testified that when D.R. was 18 years old, in August 2017, Tish learned from D.R.'s older sister that D.R. had made some "allegations" against defendant. Tish described a subsequent phone call to D.R. wherein D.R. sobbed over the phone. Later that evening, D.R., Tish, and Bobette went to the police station in Creve Coeur. Afterward, Tish informed her other daughters of D.R.'s allegations. During the conversation, Tish's other daughter "shared some information" with Tish, and Tish told the police that her other daughter should also be interviewed.

5

¶ 15    On cross-examination, Tish testified that after the divorce, D.R. would sometimes visit defendant more than every other weekend. According to Tish, D.R. would drive to defendant's home for visitation when she turned 16. Tish revealed that defendant was not invited to D.R.'s high school graduation in May 2017, however, defendant was present during D.R.'s prom pictures. On recross-examination, Tish stated D.R. did not want defendant at her graduation.

¶ 16    D.R., then 20 years old, testified that Tish and defendant were her parents. D.R. testified consistently with Tish concerning Tish's relationship with defendant and D.R.'s familial relationships. Growing up, D.R. visited her father and Bobette in Creve Coeur every weekend or so, including holidays and summers. D.R. described Bobette as a mother to her and stated that the two were close. Bobette had three children: Zak, Brionna, and Kayleigh. Defendant and Bobette broke up when D.R. was around 14 years old, but D.R. continued to visit with Bobette, though she was not seeing defendant at the time. When D.R. visited defendant's residence as a child, defendant, Bobette, and D.R.'s grandmother, Nancy, would be present. Sometimes, Bobette's children would be at the home as well. D.R. testified that she had not seen her father since prom pictures during her senior year of high school.

¶ 17    Next, in response to a prosecutor's question, D.R. stated that "my father sexually abused me when I was a kid from when I was like 8 until like 11 years old." D.R. recalled three instances of sexual assault and/or abuse. The first incident took place at defendant's home when D.R. was eight or nine years old in 2007. D.R. described defendant's home as a one-story home with three bedrooms, one for defendant and Bobette, one for Nancy, and one for the children. Around 8 or 9 o'clock that night, D.R. recalled watching "America's Most Wanted" on television in the living room with defendant, Bobette, Nancy, Zak, and Brionna. D.R. testified that after she went to bed in Nancy's room where D.R. usually slept, defendant entered the

6

bedroom to say good night to D.R. At that time, he laid down in the bed with D.R. and asked D.R. if she was hot. D.R. responded that she was not hot, but defendant had D.R. remove her red nightgown. When D.R. climbed back into bed, defendant's "penis was out and he had me touch it with my hand." Defendant was wearing jeans and a shirt. D.R. pulled her hand away, but defendant pulled her hand back and "had [D.R.] basically give him a hand job." Then, defendant touched D.R.'s vagina, removed her underwear, and put his mouth on her vagina. D.R. recalled that the door to the bedroom was open during the assault. Afterward, D.R. put her clothes on and went back into the living room to watch television. When asked if D.R. was familiar with these sex acts at the time, D.R. answered "Yes, in the sense that I had been warned about strangers and stranger danger and stuff like that." D.R. did not tell anyone what happened that night because she liked being at defendant's house more than her mother's house. D.R. explained that she did not get along with her stepfather and there were always kids at defendant's house and in the neighborhood.

¶ 18      D.R. recalled a second incident, which occurred approximately a year later when she was 9 or 10 years old. D.R. testified that she was at defendant's home in the kids' bedroom. Defendant and Bobette were home, but she could not remember if Nancy was home. D.R. was watching "That's So Raven" late at night while Bobette slept in another bedroom. Defendant came into the room and laid in bed with D.R. Defendant began to put his hand in D.R.'s panties. Then, defendant removed D.R.'s pants and put his mouth on D.R.'s vagina. Defendant got up to take a phone call and did not come back. D.R. did not speak of the incident and continued visiting defendant.

¶ 19      D.R. testified that a third incident occurred at defendant's home when she was approximately eleven years old. D.R. recalled that the incident occurred sometime in the spring

7

or the summer because there were around 10 kids sitting outside defendant's home waiting to hang out. D.R., defendant, and defendant's cousin, Bobby St. Clair, were the only ones inside the home. All three were watching television in the living room when Bobby got up to go to the kitchen and get a beer. D.R. also got up to go outside. Defendant asked D.R. to say goodbye to him, so D.R. sat down on defendant's lap. D.R. testified that defendant unbuttoned/unzipped her pants and began touching D.R.'s vagina inside of her underwear. Defendant's fingers did not go inside D.R.'s vagina. The incident took place in a minute to a minute and a half and it looked like D.R. was hugging defendant. D.R. got up, buttoned her pants, and walked outside just as Bobby walked back into the room. D.R. did not tell anyone about the incident.

¶ 20    D.R. testified that defendant never threatened her or told her not to tell anyone of the incidents. However, D.R.'s relationship with defendant changed when she was 13 or 14 years old because of an upsetting incident at the house. D.R. did not visit defendant for about six months afterward. From that point forward, D.R. used defendant's home like an apartment. D.R. would sleep, eat, and shower at the home, but spent most of her time at her friends' or cousin's home. When D.R. was 16 or 17 years old, she and defendant had a disagreement about her ex-boyfriend. D.R. explained that defendant did not like her ex-boyfriend, had a bad opinion of him, and referred to him by using the "N word." D.R. stopped seeing her father at that point. D.R. admitted defendant was present for her prom pictures because defendant's mother, Nancy, purchased the prom dress and wanted photographs of the occasion. Defendant was not invited to D.R.'s high school graduation.

¶ 21    On August 29, 2017, D.R. told her older brother, Nathan, over a text message that she did not see defendant anymore, in part, because of past sexual abuse. D.R. was 18 years old at the time. Nathan told Bobette about the conversation. Bobette subsequently messaged D.R. and told

8

D.R. to tell Tish. D.R. did not tell Tish, but Tish found out. D.R., Tish, and Bobette went to the police station in Creve Coeur to report the incidents.

¶ 22    On cross-examination, D.R. confirmed that there were other people in defendant's home during all three incidents. D.R. was unable to recall the date or the year of the first incident. D.R. briefly affirmed the general details of all three incidents, including the fact that she did not tell anyone, despite good relationships with Tish, Bobette, and Nancy. D.R. reasserted that defendant called her ex-boyfriend the "N-word." D.R. did not recall that defendant did not like her ex-boyfriend because her ex-boyfriend was involved in criminal behavior.

¶ 23    D.R. testified that she told Nathan about the incidents so that he could protect his own children. D.R. reiterated that she continued to see defendant every other weekend after the incidents and would sometimes spend the summer at his home when she was younger. D.R. did not want defendant at her graduation, and defendant did not get her a graduation gift.

¶ 24    On redirect examination, D.R. testified that while she had a good relationship with Nancy growing up, she stopped seeing Nancy when she turned 18 and started working. D.R. has not had contact with Nancy since the time law enforcement became involved in the case. Next, D.R. described the upsetting incident that occurred at defendant's home when she was 13 or 14 years old that D.R. briefly mentioned earlier in her testimony. D.R. explained that she fell, hit her knee, and started crying. Then, defendant "rushed over to me, and I didn't want him to be near me, I was upset, so I told him to get away from me you fathead. He thought I called him a fa[***], so he slapped me across the face." D.R. called Tish, who called the police. D.R. did not see defendant for six to nine months afterward. D.R. would visit Bobette instead. Finally, regarding her high school graduation, D.R. stated that she did not invite defendant, did not want

9

him to come, and did not want a graduation gift from him. D.R. denied that she made up the allegations because defendant did not get her a graduation gift.

¶ 25    Bobette Spillman testified that she dated defendant for almost 10 years starting in 2000 or 2001. Bobette lived with defendant for six to seven years at his home in Creve Coeur. D.R. was three years old when Bobette began dating defendant. D.R. came to the home every chance she got. Bobette and D.R. had a strong relationship. Bobette explained that she and defendant drank heavily during those years, including when D.R. would visit. Bobette always went to bed before defendant and worked crazy hours. Bobette kept in touch with D.R. after she split with defendant. D.R. visited Bobette every other weekend during the first year after the split.

¶ 26    On August 29, 2017, Bobette learned about D.R.'s allegations of abuse after receiving a phone call from Nathan. Bobette contacted D.R. and encouraged D.R. to tell Tish. Later, Bobette went to the Creve Coeur Police Department with D.R. and Tish. D.R. and Bobette "split ways" a year or two before trial. Bobette testified that she did not know A.M., but G.M was her niece. Bobette explained that G.M. was close with Bobette's daughter, Brionna, and would have stayed the night at defendant's home during the years in question. On cross-examination, Bobette testified that D.R. was at defendant's home every chance she got. D.R. did not report any incidents of sexual abuse to Bobette during that time.

¶ 27    Creve Coeur Chief of Police, Dale King, testified that he received a report of sexual abuse involving D.R. on or about August 30, 2017. King recalled that D.R. was physically upset, meaning angry. King spoke with D.R., filed an initial report, and forwarded the investigation to the Illinois State Police.

¶ 28    Illinois State Police Sergeant, Adam Hendrick, testified that he was the lead investigator in the case. As part of his investigation, Hendrick separately interviewed D.R., Tish, and

10

Bobette. Hendrick further observed an interview of G.M. at the Children's Advocacy Center in Tazewell County and personally interviewed A.M. at the Creve Coeur Police Department. On cross-examination, Hendrick testified that he conducted a voluntary interview of defendant.

¶ 29 At this time, the trial court conducted a jury instruction conference. During the conference, defense counsel objected to People's instruction No. 12, the propensity instruction that applied to the other-crimes or prior bad acts evidence the jury would hear next. Defense counsel explained that he had previously objected to the prior bad acts evidence in the hearing on the motion *in limine* and disagreed with the trial court's ruling on that motion. The trial court noted defense counsel's objection and stated that the instruction would be given over counsel's objection. Further, defense counsel indicated that he would like to show a standing objection to the propensity testimony but indicated to the trial court that defense counsel was considering whether or not to raise his ongoing objection in the jury's presence or whether he would be requesting a sidebar following the testimony of each propensity witness.

¶ 30 Bobette's niece, G.M., then 17 years old, testified unwillingly. G.M. testified that she spent a lot of time at defendant's home when Bobette dated defendant, which included spending the night. Bobette's daughter, Brionna, was like a sister to G.M. One night, while staying the night at defendant's home, G.M. was sleeping on the couch in the living room. G.M. woke up to find defendant's fingers touching her vagina beneath her underwear. G.M. was six to eight years old at this time. G.M. was scared. G.M. left the room and did not remember anything afterward. G.M. testified that Zak and Brionna were home that night, but G.M. did not remember any adults, other than defendant, being home. G.M. did not tell anyone what happened at the time. G.M. testified that defendant did not say anything after the incident and acted no differently toward her.

11

¶ 31     G.M. explained that she did not tell anyone at the time because she did not think the incident was "that big of a deal" because she had been sexually abused by her half-brother. When asked how the incident with defendant compared to what happened with her half-brother, G.M. stated "It was nothing. It was like, you know, it was just like a small touch. I didn't think that it was anything big or anything to be upset about." Eventually, G.M. disclosed defendant's abuse to her parents while on a camping trip in 2017. Law enforcement later interviewed G.M. at the Children's Advocacy Center.

¶ 32     Prior to defense counsel's cross-examination of G.M., both parties approached the bench for an off-the-record conversation. Afterward, the court instructed the jury:

> "Ladies and gentlemen of the jury, evidence has been received and will be received from at least one other witness that the defendant has been involved in conduct other than what is charged in the indictment. This evidence has been received or is being received on the issue of the defendant's propensity to commit crimes charged, to commit the crimes charged, meaning the instant case, and may be considered by you for that purpose. It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of the defendant's propensity to commit the crimes charged."

¶ 33     On cross-examination, G.M. affirmed that she could not remember the time of year or the year the abuse occurred. G.M. agreed with defense counsel that she disclosed the abuse to her family on a camping trip out of the blue.

¶ 34     Marie Hall testified that she was G.M.'s mother and Bobette's sister. Hall was familiar with defendant. Hall testified that G.M. told her about the abuse for the first time during a camping trip in August 2017. After hearing about the police investigation involving defendant

12

from Bobette, Hall disclosed to Bobette what G.M. told her on the camping trip. Afterward, the police contacted Hall, and Hall took G.M. to the Children's Advocacy Center to be interviewed.

¶ 35    A.M., D.R.'s older half-sister and Tish's daughter, testified that defendant was her stepfather for a time. During Tish and defendant's marriage, A.M. lived at defendant's home in Creve Coeur. After learning of D.R.'s abuse allegations in August or September 2017, A.M. disclosed two incidents of abuse involving defendant. A.M. testified the first incident occurred when she was around six years old. A.M. recalled sleeping on the couch in the living room at nighttime when defendant carried her to a bedroom and laid her in bed. Defendant put his hand underneath A.M.'s underwear and touched A.M.'s vagina. A.M. believed her other sisters were home at the time, and Tish was in the living room. The second incident occurred when A.M. was close to seven years old. A.M. testified that she awoke during the night because she was sick. Tish asked defendant to help A.M., who had to throw up in the bathroom. Defendant came into the bathroom naked, with an erect penis. Defendant asked A.M. if she would like to touch his penis, and A.M. responded that she did not. Defendant asked A.M. if she would like to kiss his penis. A.M. kissed defendant's penis "real quickly" and hurried back into her room.

¶ 36    Defendant did not tell A.M. to keep the incidents private, and A.M. did not report the incidents to anyone. Defendant did not act any differently toward A.M. after the incidents. A.M. was unaware of the specifics of the abuse D.R. endured and would not have told anyone her story but for D.R. allegations of abuse.

¶ 37    On cross-examination, A.M. testified that she did not remember the year or years of the incidents. A.M. agreed with defense counsel that others were present during the incidents and that the home was small.

¶ 38        The State rested at the conclusion of A.M.'s testimony. Outside the presence of the jury, defense counsel disclosed the substance of the off-the-record conversation the parties engaged in following G.M.'s direct examination. Defense counsel stated that he approached the bench at that time because counsel believed G.M.'s testimony about her half-brother's prior abuse violated the court's ruling barring evidence of G.M.'s past sexual history. Defense counsel argued that he altered his trial strategy with the court's ruling in mind, stating: "Frankly, I don't think it rises to the level of a mistrial, but it sure affected defense's strategy." Defense counsel requested the court to strike G.M.'s testimony or to give the jury a limiting instruction. The State pointed out that defense counsel failed to object to the contested testimony. Defense counsel answered that he chose the timing of his objection for tactical reasons. Following an extended conversation, the court refused defense counsel's request to strike the testimony. Instead, the court gave defense counsel the option to recall G.M. for additional cross-examination.

¶ 39        During the defense's presentation of witnesses to the jury, the defense recalled G.M. as permitted by the trial court. G.M. again testified defendant sexually abused her when she was between six and eight years old, and that G.M. did not think it was a big deal because of previous abuse she suffered at the hands of her half-brother. G.M. reported her half-brother's abuse when she was 9 or 10 years old. However, G.M. did not report defendant until August 2017. On cross-examination, G.M. stated that her half-brother's abuse took place for about four years before she reported it.[1]

_____

[1]Later in the proceedings, the State suggested that the court give a jury instruction limiting the jury's consideration of G.M.'s testimony about her prior sexual abuse by her half-brother. Defense counsel did not want a limiting instruction because defense counsel wished to argue in closing that G.M. promptly raised a complaint about her half-brother but did not raise a prompt complaint in the instant case. The trial court ruled that it would instruct the jury that G.M's testimony involving sexual acts with another individual could only be considered by the jury for the limited purpose of the reason for G.M.'s nondisclosure of defendant's abuse.

14

¶ 40 The defense called defendant's mother, Nancy Hackman, as a defense witness. Nancy testified that she lived at defendant's residence in Creve Coeur from 2002-2011 with defendant and Bobette. Nancy described the good relationship she had with her granddaughter, D.R. Nancy recalled G.M. being at the home, but explained that she did not have a relationship with G.M. Nancy could not recall G.M. ever spending the night at the home. Nancy described the layout of the home. Nancy explained that, depending on where you sit in the living room, you could see down the hall into Nancy's bedroom. D.R. would sleep with Nancy when she was little. Nancy stated there would never have been a time where she was in the living room watching television and defendant and D.R. were in her bedroom. Nancy did not recall an incident where defendant touched D.R. in her bedroom.

¶ 41 On cross-examination, Nancy reiterated that there would never have been a time that defendant was in her bedroom alone with D.R. Nancy explained that she was in her room most of the time but not all the time. D.R. never told Nancy about the abuse. Nancy did not believe D.R.'s abuse claims and no longer has a relationship with D.R. Nancy never witnessed defendant sexually abuse anyone. On re-direct-examination, defense counsel asked Nancy why she did not believe D.R.'s story, to which Nancy responded, "my son wouldn't do it because I raised him better than that and he wasn't that type of person."

¶ 42 Nicholas Vance testified that he babysat defendant and/or Tish's children from 1998 through 2000. During that time, Vance did not receive any complaints about defendant from the girls and never saw anything unusual. On cross-examination, Vance testified that he had not seen the children since around that time. Vance further testified that he never watched D.R.

15

¶ 43        Defendant testified that he had lived in his home in Creve Coeur since 1968. Defendant denied sexually assaulting and/or abusing D.R.,[2] A.M., or G.M. Defendant was married three times. He had two children, Nathan and Monica, with his first wife, Kim, and one child, D.R., with his second wife, Tish. Defendant lived in the home from 1997 to 2001 with Tish, D.R., Tish's other daughters, and occasionally Monica and Nathan. Between 2007 and 2009, defendant worked as a conductor for Union Pacific Railroad. Defendant denied that he abused D.R. in Nancy's bedroom between 2007 and 2009. Similarly, defendant denied that any sexual act with D.R. took place in the kids' room during that period. Defendant testified that the incident in the living room when his cousin, Bobby St. Clair, got up to get a beer, never happened. Defendant stated that his home was very small. D.R. never spoke of sexual abuse to defendant. Defendant had "no clue" where D.R.'s allegations were coming from.

¶ 44        Similarly, defendant denied any knowledge of a sexual incident involving A.M. in 1998 or 1999. Defendant could not recall any incident where he was asked to care for A.M. in the bathroom in the middle of the night. Defendant also denied that any incident occurred between 2007 and 2009 where defendant inappropriately touched G.M. on the living room couch. Defendant stated that G.M. was not allowed on the couch because she wet herself. Defendant could not think of any reason that A.M. or G.M. would make these accusations.

¶ 45        Defendant testified that his relationship with D.R. was fine until she began dating her ex-boyfriend, of whom defendant did not approve. Defendant stated that while "[t]hey use different variations[,]" I called him a "hoodlum." Defendant stated "[h]e's always been around the neighborhood, and he's a thug and so I didn't like him so she liked him to spite me for disliking him because I wouldn't let him around the house or her to see him." Defendant denied disliking

_____

[2]During his questioning, defense counsel misspoke and asked defendant if he had ever sexually abused "Tiffany[,]" meaning D.R.

16

D.R.'s ex-boyfriend because of his race and denied using the "N" word in reference to him. Defendant stated that he stopped letting D.R. stay at his home because she would not abide by his curfew rules. Defendant confirmed that he last saw D.R. at prom pictures in the early summer of 2017. Defendant stated that he shook D.R.'s ex-boyfriend's hand, told him he looked nice, and gave D.R. a hug. Defendant did not attend D.R.'s graduation because he was not invited. Defendant described D.R.'s relationship with Nancy as inseparable. Defendant testified that he voluntarily spoke with the police and told them he did not commit the assaults.

¶ 46 On cross-examination, defendant testified that his relationship with D.R. soured a year to a year and a half before the abuse allegations came out. When the investigation began in August or September 2017, defendant told the police that D.R. did not come to pick up her Christmas presents from the year before. Similarly, defendant did not pick up her birthday gifts in March 2017. At the time of the investigation, defendant assumed D.R. made the allegations because he did not get her a graduation gift. Defendant testified that he had not seen A.M. since she was a small child. Defendant did not believe G.M. ever spent the night at his home, but she was sometimes sleeping at his home up until 11 p.m. when her parents would pick her up after bowling. Defendant had not interacted with G.M. for eight or nine years.

¶ 47 After the defense rested, the trial court gave the following pertinent instructions to the jury:

> "Evidence has been received that the defendant has been involved in conduct other than what is charged in the indictment. This evidence has been received on the issue of the defendant's propensity to commit the crimes charged and may be considered by you for that purpose. It is for you to determine whether the  defendant was involved in

17

that conduct and, if so, what weight should be given to this evidence on the issue of the defendant's propensity to commit the crimes charged," and

"Evidence has been received that [G.M.] has been involved in sexual acts with another individual. This evidence can only be considered by you for the limited purpose as to the issue of her nondisclosure."

¶ 48    The jury found defendant guilty on all three counts. The trial court sentenced defendant to 23 years of imprisonment in the Illinois Department of Corrections. Defendant appeals.

¶ 49                                II. ANALYSIS

¶ 50    Defendant challenges his convictions on three grounds. First, defendant requests a new trial due to the improper introduction of propensity evidence pursuant to section 115-7.3 of the Code. 725 ILCS 5/115-7.3 (West 2018). Defendant asserts he received ineffective assistance of defense counsel and simultaneously argues that several evidentiary issues amounted to plain error. Defendant also claims his convictions should be reversed where the State's evidence did not prove the crimes charged beyond a reasonable doubt.

¶ 51                            A. Propensity Evidence

¶ 52    In the instant case, the trial court granted the State's pretrial motion *in limine*, allowing the State to introduce other-crimes and/or prior bad acts evidence pursuant to section 115-7.3 of the Code. 725 ILCS 5/115-7.3 (West 2018). Section 115-7.3 of the Code dictates when evidence of other crimes or prior bad acts is admissible to demonstrate a propensity to commit certain sex offenses. *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 31; 725 ILCS 5/115-7.3 *et seq*. (West 2018). Section 115-7.3(c) provides:

"In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

18

(1)  the proximity in time to the charged or predicate offense;

(2)  the degree of factual similarity to the charged or predicate offense; or

(3)  other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2018).

¶ 53      The trial court's decision to admit other-crimes or prior bad acts evidence pursuant to section 115-7.3 is reviewed for an abuse of discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). A trial court abuses its discretion where the court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the take the view adopted by the court. *Id*. In this case, the trial court found that the proposed other-crimes or prior bad acts evidence to be "very, very probative." We agree.

¶ 54      Regarding the proximity of the prior bad acts to the time frame for the charged offenses, we note that the prior bad acts evidence consisted of alleged sexual misconduct by defendant that took place against G.M. sometime during 2007-2009 when she was six to eight years of age and against A.M., sometime during 1998-2001, when A.M was five to eight years of age. In comparison, the charged offenses allegedly occurred when D.R. was 8 to 11 years of age, sometime between 2007-2011.

¶ 55      Defendant first argues the alleged incidents involving A.M. created undue prejudice because the alleged events took place approximately ten years before the incidents with D.R. No bright-line rule exists to mark when other-crimes evidence is deemed inadmissible because it is too remote in time to the charged offenses. *Id*. at 183-84. Rather, courts evaluate the proximity issue on a case-by-case basis. *Id*. at 183.

¶ 56      As our supreme court noted, while the passage of, for instance, 12 to 15 years, may lessen the probative value of the evidence, "standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it." *Id*. at 184. While the testimony

of A.M. pertained to misconduct that took place between 1998 and 2001, 10 years prior to the occurrence with D.R., this time frame is not so remote in time that the trial court can be said to have abused its discretion with respect to the consideration of proximity.

¶ 57    Next, the statute requires that the proponent of the other-crimes or prior bad acts evidence must show some factual similarity to the crimes charged. *Id*. "As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence." *Id*; see *People v. Smith*, 406 Ill. App. 3d 747, 753 (2010). In this case, the trial court found that the alleged prior bad acts followed a similar pattern. We agree. For example, all three victims, D.R., A.M., and G.M., experienced very similar sexual assaults and/or abuse. All three victims were family members, in one way or another, who frequented defendant's home. All the alleged assaults, excluding the incident where D.R. sat on defendant's lap, occurred at night while the victims were either going to bed, sleeping, or were awakened from sleep. All three victims testified consistently that defendant acted like the incidents never happened and agreed defendant did not instruct any victim to not report the sexual contact. Lastly, all three victims were similar in age when the assaults occurred, D.R. between 8 and 11, A.M. between 5 and 8, and G.M. between 6 and 8 years old.

¶ 58    Our analysis of the statutory factors enumerated in section 115-7.3(c) reveals a compelling case for the admission of the contested evidence. Thus, we conclude the trial court did not commit an abuse of discretion by granting the State's motion *in limine*.

¶ 59                    B. Ineffective Assistance of Counsel/Plain Error

¶ 60    Next, defendant argues he was denied the effective assistance of counsel, citing defense counsel's failure to object to: (1) certain hearsay statements; (2) D.R.'s reference to racial and homophobic slurs; (3) opinion testimony regarding D.R.'s lack of credibility; (4) G.M.'s prior

20

consistent statements introduced by the State; (5) the other-crimes/propensity jury instruction given by the trial court; and (6) the introduction of evidence regarding G.M.'s prior sexual history. After fully developing his ineffective assistance arguments, defendant further posits that he forfeited review of the alleged errors where counsel failed to object and urges this court to excuse this forfeiture based on either prong of plain error.

¶ 61     To demonstrate ineffective assistance of counsel on direct appeal, defendant must first establish that counsel's performance was objectively unreasonable under prevailing professional norms. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Similarly, if forfeiture applies and should be excused under a plain error analysis, then defendant must first demonstrate to the appellate court that clear and obvious error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Our supreme court has further instructed that "[p]lain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, i.e. that the verdict "may have resulted from the error and not the evidence" properly adduced at trial [citation] (plain error)); or that there was a "reasonable probability" of a different result had the evidence in question been excluded [citation]. *People v. White*, 2011 IL 109689, ¶ 133.

¶ 62     With these principles in mind, this court will first review whether error occurred at all (*Thompson*, 238 Ill. 2d at 613) and will parse whether the error, if any, warranted an objection, prejudiced defendant, or arose from sound trial strategy.

21

¶ 63                                    1. Hearsay

¶ 64        Defendant asserts he received ineffective assistance of counsel because defense counsel

allowed the introduction of certain hearsay statements without objection. The State contends that

the testimony at issue does not qualify as inadmissible hearsay.

¶ 65        Hearsay "is a statement, other than one made by the declarant while testifying at the trial

or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff.

Oct. 15, 2015). Out-of-court statements offered for purposes other than to prove the truth of the

matter asserted are not hearsay. *People v. Moss*, 205 Ill. 2d 139, 159 (2001); *People v. Kliner*,

185 Ill. 2d 81, 150 (1998).

¶ 66        Defendant asserts the following testimony constituted inadmissible hearsay: (1) D.R.'s

testimony about her text message conversation with her brother; (2) D.R.'s testimony that her

brother contacted Bobette to apprise Bobette of D.R.'s allegations; and (3) Bobette's testimony

as to how she learned of D.R.'s allegations. Following our careful review of the record, we

conclude these portions of D.R. and Bobette's testimony were not offered for the truth of the

matter asserted but rather to explain the chronological progression and the delayed timing of

D.R.'s first report of defendant's sexual misconduct. In other words, this testimony does not

qualify as hearsay. Thus, we are not persuaded that clear error occurred here or that counsel

could have successfully excluded this testimony by raising an objection.

¶ 67                              2. Racial/Homophobic Slurs

¶ 68        Next, defendant agues portions of D.R.'s testimony that improperly referenced both racial

and homophobic slurs served to prejudice defendant in the eyes of the jury. To provide context to

defendant's claims, a brief recitation of the trial testimony on these matters is necessary. On

direct examination, D.R. testified that she had a disagreement with defendant about her ex-

boyfriend. During this verbal argument with defendant, defendant allegedly referred to her ex-boyfriend by using the "N-word." D.R. further reiterated that defendant referred to her ex-boyfriend as the "N-word" on re-direct examination. D.R. also described an event during her testimony where defendant misheard D. R. refer to him as a "fa[***]" when in fact she called him a "fathead."

¶ 69     For purposes of the resolution of this issue, we will presume the comments could have impacted the jury's impartiality toward defendant. Nonetheless, the isolated references to these inflammatory slurs during D.R.'s testimony were spontaneous and unsolicited by the prosecutor's direct examination. Defense counsel's failure to object may have been sound trial strategy to avoid unduly emphasizing these remarks. Hence, the record must be more fully developed in a postconviction context to determine if counsel exercised sound trial strategy by remaining silent. In cases such as this, where the record subject to review is not adequate to fairly resolve the claimed ineffective assistance of defense counsel, the better avenue is to pursue postconviction relief. *People v. Veach*, 2017 IL 120649, ¶ 46. The record in the case before us does not indicate why counsel did not object to the unsolicited racial and homophobic slurs, thus preventing this court from considering whether counsel's failure to object constituted sound trial strategy. For that reason, these purported inadequate responses by defense counsel are better suited to collateral proceedings.

¶ 70                              3. Improper Questioning

¶ 71     Next, defendant argues trial counsel was ineffective for failing to object to Nancy's testimony about D.R.'s credibility. At trial, Nancy was called as a defense witness. On direct examination, Nancy testified that there would never have been an opportunity for defendant to assault/abuse D.R. in the manner D.R. described. On cross-examination, in an apparent attempt

23

to demonstrate Nancy's inherent bias as defendant's mother, the prosecutor twice asked Nancy if she believed D.R.'s allegations. Nancy responded, "No, I don't." Defendant contends this testimony created improper sympathy for D.R. in the eyes of the jury.

¶ 72 Plainly, Nancy's answers to the prosecutor's questions were more likely to damage D.R.'s credibility than to appeal to the juror's sympathies. Thus, we are not persuaded that Nancy's testimony prejudiced defendant because it supported defendant's view that G.M.'s allegations were not worthy of belief. For these reasons, we do not find ineffective assistance of counsel or plain error based on this allegation of error.

¶ 73                                4. Prior Consistent Statement

¶ 74 Defendant further argues the State improperly bolstered G.M.'s testimony by introducing two prior consistent statements by G.M. Specifically, defendant alleges G.M.'s testimony about disclosing defendant's misconduct to her parents on a camping trip and G.M.'s reference to her interview at the Children's Advocacy Center improperly bolstered G.M.'s testimony. Defendant argues defense counsel was ineffective for failing to object to the testimony.

¶ 75 First, defendant appears to be arguing that G.M. bolstered her own credibility by describing the first time she told her parents about defendant's misconduct during a family camping trip and describing that she was interviewed at the Children's Advocacy Center. This was G.M.'s actual trial testimony and was not duplicative of a prior consistent statement. G.M.'s testimony demonstrated that she did not make a prompt complaint to anyone. Further, her reference to reporting the sexual misconduct did not include the statements she made to her parents or during a prior interview. Moreover, as a matter of trial strategy, this was utilized by the defense to attack G.M.'s credibility based on the delay of her disclosure.

¶ 76    Simply stated, there can be no error here based on prior consistent statements where no prior consistent statements were introduced. We conclude defense counsel was not obligated to make futile objections to admissible testimony.

¶ 77                                    5. Propensity Instruction

¶ 78    Next, defendant asserts that defense counsel's performance was substandard because defense counsel should have objected to the court's limiting jury instruction, during trial, just before defense counsel cross-examined G.M. Further, it appears that defendant takes issue with defense counsel's decision to make a standing objection to the other-crimes or prior bad acts evidence rather than objecting to the admission of the evidence both times the State presented the propensity witnesses.

¶ 79    First, we address the inference that defense counsel was ineffective for failing to strenuously object to the propensity evidence during the testimony of the two propensity witnesses. Here, the trial court made a clear record for purposes of our review. Based on the trial court's statement on the record, it is apparent that defense counsel mounted a standing objection to the other-crimes and/or prior bad acts evidence for purposes of the entire jury trial.

¶ 80    The record further reveals that defense counsel contemplated whether or not to raise his ongoing objection in the jury's presence and ultimately employed the side bar method to preserve his objection to the evidence. Thus, we are unable to hold that defense counsel was ineffective for failing to object when the record reveals counsel's strenuous objections.

¶ 81    Defendant also claims defense counsel passively stood by as the trial court gave a limiting instruction to the jury about the propensity evidence during the State's case-in-chief. Contrary to defendant's contention on appeal, counsel objected to the trial court's limiting instruction during the course of the trial. In fact, the trial court noted that the limiting jury

25

instruction would be given over defense counsel's objection. Thus, trial counsel preserved the issues for our review.

¶ 82    In this case, the record reflects that counsel strenuously objected to both the entirety of the other-crimes and/or prior bad acts evidence prior to and throughout the jury trial. The record also refutes defendant's argument that defense counsel neglected to object to the court's limiting instruction pertaining to this evidence. Thus, we conclude that neither ineffective assistance of counsel nor plain error occurred on this basis.

¶ 83                              6. Victim's Prior Sexual History

¶ 84    Lastly, defendant argues trial counsel was ineffective by failing to object when G.M. testified that she had previously suffered sexual abuse at the hands of an individual other than defendant. Defendant points out that evidence pertaining to the propensity witnesses' prior sexual histories was specifically barred by court order and that defense counsel was ineffective for failing to move for a mistrial based on G.M.'s own reference to her prior experience. Defendant argues the testimony improperly bolstered G.M.'s credibility because it appealed to the sympathies of the jury.

¶ 85    Here, the trial court allowed the State's motion *in limine* requesting a court order to bar evidence of D.R., A.M., and G.M.'s prior sexual histories pursuant to section 115-7 of the Code. 725 ILCS 5/115-7 (West 2018). The record reveals that, without prompting from the State, G.M. testified that she had been sexually abused by her half-brother in response to the State's query as to why G.M. did not disclose defendant's sexual misconduct.

¶ 86    Defense counsel did not levy a simultaneous objection but instead approached the bench for an off-the-record conversation following G.M.'s direct testimony. Later, after A.M.'s testimony, defense counsel approached the bench. At this time, counsel disclosed that the

substance of the earlier off-the-record conversation between the parties was the violation of the court order barring evidence of the propensity witnesses' sexual histories. Defense counsel argued that he altered his trial strategy with the court's pretrial order in mind. Despite the protections afforded to witnesses pursuant to section 115-7, the State conceded, "this opens the door and I expect [defense counsel] to cross [G.M.] on that."

¶ 87 Thus, as a curative measure, the court gave defense counsel the option to recall G.M. back for additional examination concerning her half-brother's sexual misconduct and her disclosure of defendant's sexual misconduct. Defense counsel later recalled G.M. G.M. briefly testified about her age when the abuse at the hands of her half-brother occurred. Defense counsel was able to ask about G.M.'s disclosure of her half-brother's abuse relative to her disclosure of the allegations against defendant. Then, at the conclusion of the trial, the trial court issued an instruction which limited the jury's consideration of G.M.'s prior sexual activity with another individual to the issue of G.M.'s nondisclosure of the allegations against defendant.

¶ 88 Based on this record, we are unable to conclude that G.M.'s spontaneous testimony constituted clear error. Section 115-7 affords a shield to witnesses, but this shield is not absolute, and G.M.'s testimony arguably opened the door to further questioning on the topic. See *People v. Hill*, 289 Ill. App. 3d 859, 862-63 (1997). Even if error did occur, the curative measures instituted by the trial court obviated any prejudice defendant may have suffered.

¶ 89 Here, defense counsel successfully demanded that the trial court institute curative measures following G.M.'s testimony. Pursuant to counsel's demands, the trial court allowed defense counsel to recall G.M. back to the witness stand to cross-examine G.M. about her failure to promptly report defendant's alleged sexual misconduct toward her. Further, defense counsel assisted the court when developing a curative instruction. The trial court's approach not only

27

limited the scope of the jury's consideration of the testimony, but also allowed defense counsel to reference the testimony during argument about G.M.'s failure to promptly report defendant's misconduct. Based on this record, we are able to reach the conclusion that defense counsel provided unsound representation with respect to G.M.'s revelation and are unable to find that defendant established prejudice.

¶ 90      Lastly, defendant argues in his brief that these alleged errors by defense counsel, in combination, culminated into structural error for purposes of a plain error analysis. This argument is not persuasive as errors recognized as structural include "a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *Thompson*, 238 Ill. 2d at 609 (2010) (citing *Washington v. Recuenco*, 548 U.S. 212 (2006)).

¶ 91      As discussed in the analysis above, we conclude that defendant's separate allegations of ineffective assistance of counsel are either unpersuasive or premature due to an incomplete record. Based on this record, defendant fails to establish ineffective assistance of counsel and/or plain error.

¶ 92                                 C. Sufficiency of the Evidence

¶ 93      Lastly, defendant argues the State failed to meet its constitutional burden of proving defendant guilty of the crimes charged beyond a reasonable doubt because D.R.'s testimony lacked credibility. The State argues a reasonable fact finder, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crimes proven beyond a reasonable doubt.

¶ 94    To review, the jury found defendant guilty of one count of predatory criminal sexual assault of a child and two counts of aggravated criminal sexual abuse as charged in the indictment. When reviewing the sufficiency of the evidence, our court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of each alleged crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the responsibility of the trier of fact to determine the credibility of the witnesses, to weigh the witness testimony, to resolve conflicts in the evidence, and to draw reasonable inferences that flow from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). Reviewing courts must give due consideration to the reality that the trier of fact saw and heard the witnesses and the evidence firsthand. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). However, the jury's credibility determinations are not conclusive. *Id*. at 542. Rather, on appellate review, "we will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Id*. at 542.

¶ 95    Here, defendant challenges the credibility of D.R.'s testimony based on the passage of time before she reported defendant's misconduct. Further, defendant argues D.R.'s testimony could not have been true because it is unlikely the sexual assaults could have taken place while other persons were present in defendant's home.

¶ 96    We agree this case hinged on the jury finding the State's witnesses to be credible. If the jury found D.R.'s testimony credible, the evidence was more than sufficient to sustain defendant's convictions. Here, the jury remained in a superior position to determine the credibility of the witnesses, including D.R., to weigh each witness's testimony, and then resolve conflicts, if any, in the testimony. The jury clearly found D.R.'s testimony to be credible after

29

hearing the testimony firsthand. Thus, after viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt.

¶ 97                                III. CONCLUSION

¶ 98        The judgment of the circuit court of Tazewell County is affirmed.

¶ 99        Affirmed.